UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- x
KSW MECHANICAL SERVICES,                           :
                                                   :
                        Plaintiff,                 :
                                                   :            **MEMORANDUM & ORDER**
           -against-                               :
                                                   :              12-CV-4779 (VMS)
JOHNSON CONTROLS, INC.,                             :
                                                   :
                        Defendant.                 :
--------------------------------------------------------- x

--------------------------------------------------------- x
JOHNSON CONTROLS, INC.,                             :
                                                   :
                        Counter Claimant,          :
                                                   :
           -against-                               :
                                                   :
KSW MECHANICAL SERVICES, INC.,                      :
                                                   :
                        Counter Defendant.  :
--------------------------------------------------------- x

**Scanlon, Vera M., United States Magistrate Judge:**

Defendant and Counter Claimant  Johnson Controls, Inc. ("JCI" or "Defendant") moves pursuant to Federal Rule of Civil Procedure ("FRCP") 56(a) for an order of summary judgment 1) granting its second counterclaim alleging that Plaintiff and Counter Defendant KSW Mechanical Services, Inc. ("KSW" or "Plaintiff") violated the New York Uniform Commercial Code (the "UCC"), N.Y. U.C.C. § 2-709, by failing to complete payment for goods delivered and accepted by KSW, and 2) dismissing KSW's claim alleging a breach of contract.  For the following reasons, Defendant's motion is denied.

1

## I.     BACKGROUND

As required on a motion for summary judgment, all facts are drawn in the light most favorable to KSW, the non-moving party.  See O & G Indus., Inc. v. Nat'l R.R. Passenger Corp., 537 F.3d 153, 159 (2d Cir. 2008).

KSW is a Delaware corporation with a principal place of business located in Long Island City, New York.  See Verified Compl. ("Compl.") ¶ 1, Aug. 15, 2011, ECF No. 1 at Ex. A.  On May 20, 2010, KSW entered into a contract to provide mechanical work for a project known as the Mount Sinai – Center for Science and Medicine (the "Project").  Id. ¶ 3.

JCI is a Wisconsin corporation with its principal place of business located in Milwaukee, Wisconsin.  Id. at ¶ 2.  On June 9, 2010, KSW contracted with JCI for JCI to provide air handling units ("AHUs") for the Project, at a cost of $3.4 Million (the "Purchase Order").  Id. at ¶ 4.  The Purchase Order stated, inter alia, that the AHUs would be provided "complete with all items as specified," would "ship in multiple sections"[1] and that JCI would "[p]rovide all supervision, components, etc. for field assembly of sections by sheetmetal and piping contractors."  Aff. of William J. Anderson ("Anderson Aff."), Ex. A at 9, Oct. 30, 2013, ECF No. 26-5 & 26-6 (Exhibits A-D); see Compl. ¶ 7.  The contract had also specified that JCI test the AHUs in the factory, but KSW later waived the requirement for factory testing due to timing issues.  Compl. ¶ 9.

JCI delivered the AHUs in sealed crates to the rigger's yard between January 21, 2011 and mid-May 2011.  Anderson Aff. ¶ 13; Aff. of Penny Olfano Clark ("Clark Aff.") ¶¶ 3, 9, Nov. 27, 2013, ECF No. 27-1.  The AHUs would eventually be rigged to the 11th floor of the Project.

---

[1] By industry standards, "a section is the largest portion of an air handling unit that could be economically shipped and rigged into the building."  Aff. of Floyd Warkol ("Warkol Aff.") ¶ 9, Nov. 27, 2013, ECF No. 27.  Rigging refers to moving large objects, such as by crane.

Anderson Aff. ¶ 15.  According to Floyd Warkol ("Mr. Warkol"), the Chief Executive Officer of KSW, it is the custom and practice in the construction industry to not unpack sealed crates outdoors at a rigger's yard, but to unseal them after they are delivered by the rigger.  Anderson Aff. ¶ 14; see Clark Aff. ¶ 5 (stating it would be "foolhardy" to unpack sealed crates in a rigger's yard).[2]

Nevertheless, KSW's employees provided testimony that at least some unpacking occurred at the rigger's yard, prior to delivery at the Project site.  Penny Olfano Clark ("Ms. Clark"), KSW's Project Manager for the Project, described a JCI employee assisting with opening sealed crates in late April and early May 2011.  Clark Aff. ¶¶ 1, 8.[3]  Ms. Clark also described KSW's and JCI's attempts, at the rigger's yard, to catalog items delivered to determine their weights and sizes, and to construct a "mock up" "to ascertain how the sections could be assembled."  Clark Aff. ¶¶ 6-10; see Aff. of James J. Barriere ("Barriere Aff.") ¶ 11 & Ex. H, Nov. 1, 2013, ECF No. 26-3 & 26-4 (including excerpts from the deposition of Eduard Kochoumian, a Project Manager for KSW who testified about the mock up).

No later than May 5, 2011, in connection with creating the mock up, KSW had the "[i]mpression" that the AHUs "were not built up in the factory and knocked down for shipment but [were] parts manufactured and put in crates [without pre-assembly]."  Clark Aff. ¶ 9 & Ex. 17.  However, KSW contends that it was not until approximately mid-June 2011, after the crates were rigged to the Project and then unpacked, that KSW was able to understand the "full

---

[2] JCI claims that KSW employees photographed the deliveries at the rigger's yard as they arrived (presumably after opening the crates) in order to identify the various sections and pieces.  See Def. 56.1 ¶ 14.  However, KSW denies that any photographs were taken until May 2011, after the rigger delivered the AHUs to the 11th floor of the Project.  Clark Aff. ¶¶ 4-5.

[3] Ms. Clark's affidavit states that sealed crates were opened in late April and early May 2010. The Court assumes that "2010" is a typographical error; otherwise this event would pre-date the June 2010 Purchase Order.

3

dimension" of the problem.  Clark Aff. ¶ 11.  The Purchase Order had specified that JCI would split each AHU into twelve pre-assembled sections, but only eight of the sections were shipped pre-assembled, and four sections were shipped in pieces, located in 64 crates.  Clark Aff. ¶ 12 & Ex. 3; Compl. ¶ 11.  In addition, multiple pieces did not fit properly when assembled.  Compl. ¶ 14.

KSW contends that it put JCI on notice of its breach of contract.  See Compl. ¶ 13.  On June 6, 2011, Ms. Clark emailed a senior JCI employee (and copied several JCI and KSW employees on the email), describing KSW's dissatisfaction with the AHUs not arriving in sections and the problems that had caused KSW.  Clark Aff. ¶ 12 & Ex. 19.  Ms. Clark wrote, "Please be informed that all work and rigging costs associated with the assembly of these [unassembled] sections and [sic] not described in our contract will be monitored and passed along to JCI."  Clark Aff. ¶ 12 & Ex. 19.   On June 13, 2011, Ms. Clark sent another email to the same senior JCI employee and several other JCI and KSW employees in which she reiterated her concerns, described additional deficiencies with the AHUs and again stated, "Please be aware that since we were not informed that these units were coming KD'd [knocked down] – assembly time for this process was not purchased by us from our Contractor[s].  The cost of this extra time will be Johnson's responsibility."  Clark Aff. ¶ 13 & Ex. 20.  Likewise, minutes prepared by Ms. Clark from a June 30, 2011 meeting between KSW and JCI employees included the statement, "[t]he Contractors building these units will be paid from JCI's money held by KSW since they can not [sic] be expected to finance this additional cost."  Clark Aff. ¶ 14 & Ex. 21.  According to KSW, JCI later "backed away" from this resolution, and on August 16, 2011, Mr. Warkol wrote to JCI's General Manager, again complaining that "[t]he units were not built and assembled as specified and were not shipped as specified."  Clark Aff. ¶ 15 & Ex. 22.

KSW filed an action in the Supreme Court of the State of New York, County of Queens, alleging breach of contract. The total costs KSW attributes to JCI's alleged breach are $1,833,555. <u>See</u> Barriere Aff. Ex. G ¶ 12 (attaching a damages chart).[4] As described in more detail below, these damages include amounts both paid and outstanding for subcontractors' work, and KSW's own increased overhead and lost profits. <u>Id.</u> In addition, of the original $3,400,000 contract price, KSW paid JCI a total of $2,432,992, which left $967,008[5] outstanding. <u>Id.</u> ¶¶ 18-19; Def.'s Statement of Material Facts ("Def. 56.1") ¶ 23, Oct. 30, 2013, ECF No. 26-7.

JCI removed this action to federal court, on the basis of diversity. Notice of Removal, Sept. 24, 2012, ECF No. 1. The Parties consented to have this case tried before the undersigned. Consent to Jurisdiction by U.S. Magistrate Judge, Feb. 21, 2013, ECF No. 11.

Defendant's final Answer asserted three counterclaims, including breach of contract, violation of the UCC, and unjust enrichment. Second Am. Answer ("Answer") ¶¶ 18-34, Aug. 8, 2013, ECF No. 13. JCI seeks counterclaim damages of $967,008 (the outstanding balance on the Purchase Order), plus interest, costs and disbursements. Mem. of Law in Supp. of Def.'s Mot. for Summary Judgment ("Def. Mem.") 1, Nov. 1, 2013, ECF No. 26-9; Def.'s Reply Mem. of Law in Further Supp. of Mot. for Summary Judgment ("Def. Reply Mem.") 10, Dec. 9, 2013, ECF No. 28.[6]

---

[4] KSW initially alleged that it incurred costs of $1,821,728, not $1,833,555. Compl. ¶ 17.

[5] In its Complaint, KSW states that the difference is $847,008, not $967,008. The Court assumes this was a typographical error because in its responsive 56.1 statement, Plaintiff does not dispute that the balance due is $967,008, not $847,008. Pl.'s Resp. to Def.'s Statement of Material Facts ("Pl. 56.1"), Nov. 27, 2013, ECF No. 27-3 (containing no objection to Def. 56.1 ¶ 23). <u>See</u> <u>Galasso v. Eisman, Zucker, Klein & Ruttenberg</u>, 310 F. Supp. 2d 569, 576 (S.D.N.Y. 2004) (facts that are uncontroverted in a responsive 56.1 are deemed admitted).

[6] Defendant originally sought judgment in the amount of $948,000, plus interest, costs and

5

## II.    DISCUSSION

JCI moves for summary judgment to grant its counterclaim alleging a violation of the UCC § 2-709, and to dismiss KSW's breach of contract claim.  Def. Mem. 1.  Pursuant to FRCP 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 737 F.3d 166 (2d Cir. 2013) (same).  In deciding a motion for summary judgment, the court must consider "the facts in the light most favorable to the nonmoving party and resolve all factual ambiguities in its favor."  O & G Indus., 537 F.3d at 159; see Easterling v. Collecto, Inc., 692 F.3d 229, 233 (2d Cir. 2012) (same).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 574 (2d Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).   "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'"  Toussie v. Cnty. of Suffolk, 806 F. Supp. 2d 558, 571 (E.D.N.Y. 2011) (quoting Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)).

### A.    JCI's Motion For Summary Judgment On Its Counterclaim

For the reasons stated below, JCI's motion for summary judgment concerning its counterclaim is denied in its entirety.

---

disbursements.  Answer ¶¶ 28, 34.

### 1.   The UCC Applies to the Purchase Order

As a preliminary matter, the Parties dispute whether the Purchase Order is governed by the UCC.  The UCC "applies to transactions in goods."  N.Y. U.C.C. Law § 2-102.  "'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ."  N.Y. U.C.C. Law § 2-105(1).  Contracts for goods which involve—incident to the sale of goods—services such as installation, maintenance, testing, instruction or supervision are still subject to the UCC.  See Richard A. Rosenblatt & Co., Inc. v. Davidge Data Sys. Corp., 295 A.D.2d 168, 743 N.Y.S.2d 471, 472 (1st Dep't 2002) (holding that a contract for the installation and maintenance of computer hardware and software was subject to the UCC).

In this case, the Purchase Order required JCI to "[f]urnish and deliver the Air Handling Units" in accordance with certain plans and specifications which included, inter alia, designing and testing the AHUs, and supervising their installation by third-parties.  Anderson Aff. Ex. A (ECF 26-6 at 2, 4-5, 7); see Clark Aff. ¶ 16; Pl. Mem. 3.  Such "contracts for the sale of sophisticated equipment frequently provide for some initial supervision, testing and instruction by the manufacturer," and these contracts are nevertheless governed by the UCC because they primarily concern the sale of goods.  Richard A. Rosenblatt & Co., 295 A.D.2d 168, 743 N.Y.S.2d at 472 (quoting J.I. Hass Co., Inc. v. Frank A. Kristal Assocs., Inc., 127 A.D.2d 541, N.Y.S.2d 104 (1st Dep't 1987)).

It is clear from the four corners of the Purchase Order that furnishing and delivering the AHUs was the predominant purpose of the contract.  See Anderson Aff. Ex. A.  Only these elements of the agreement appear on front page of the Purchase Order; the various riders and exhibits that follow then explain the details of the job, including incidental services.  These

7

services can only be described as incidental to the sale of goods because they involve testing or supervising the assembly and "start up" of the AHUs to verify their performance.  Further supporting a finding that the services were incidental, KSW does not even mention JCI's services when describing the contract in its Complaint.  Compl. ¶¶ 4-14; see Old Country Toyota Corp. v. Toyota Motor Distribs., Inc., 966 F. Supp. 167, 169 (E.D.N.Y. 1997) (stating that courts may look to "the face of the complaint" when considering whether an agreement is subject to the UCC).

In the cases cited by KSW to support an argument that the contract is not governed by the UCC, see Pl. Mem. 3-4, the main purpose of the contract was a construction project where the goods at issue were only incidental to the labor and services being provided.[7]  The UCC is not applicable to such construction contracts.  See Schenectady Steel Co., 43 A.D.2d at 236, 350 N.Y.S.2d at 923.  The fact that the goods in this case were related to "a construction project," see Pl. 56.1 ¶ 3, is immaterial.  KSW does not argue, nor could it, that the Purchase Order was for a construction project.

Thus, this Court finds as a matter of law that the UCC applies to the Purchase Order because it predominately involved a sale of goods and any services were incidental to that sale.[8]

---

[7] See Gibraltar Mgmt. Co., Inc. v. Grand Entrance Gates, Ltd., 46 A.D.3d 747, 748, 848 N.Y.S.2d 684, 686 (2nd Dep't 2007) (the contract was not subject to the UCC where it "was predominantly for the performance of labor and for services in connection with the construction of new entrances at the plaintiff's real property, of which the installation of the subject gates was merely a part"); Schenectady Steel Co., Inc. v. Bruno Trimpoli Gen. Const. Co., Inc., 43 A.D.2d 234, 237, 350 N.Y.S.2d 920, 923 (3rd Dep't 1974) ("Respondent was not contracting simply for the steel beams but in essence for their erection and installation with the transfer of the title to the steel a mere incident of the overall transaction, a mere accessory to the work and labor to be performed."), aff'd, 34 N.Y.2d 939, 316 N.E.2d 875 (1974).

[8] As JCI's deliveries dated between January 21, 2011 and mid-May 2011, see Clark Aff. ¶¶ 3, 9, there is no issue concerning whether the shorter statute of limitations applicable to breach of contract claims under the UCC is a bar to Plaintiff's claim.  See Jackson v. Eddy's LI RV Ctr., Inc., 845 F. Supp. 2d 523, 531 (E.D.N.Y. 2012) (stating that New York breach-of-contract

### 2.      Genuine Issues of Material Fact Exist
###          as to JCI's Counterclaim

JCI argues that UCC § 2-709 mandates summary judgment in its favor because KSW accepted the goods at issue; moreover, JCI contends, KSW's damages must be barred because they allegedly concern consequential damages.  Def. Mem. 8; Def. Reply Mem. 6.  According to JCI, KSW must pay the full contract price because it accepted and used the goods.  Def. Mem. 8-11; see N.Y. U.C.C. Law §§ 2-607(1) & 2-709(1).  JCI cites to numerous cases, such as Shokai Far East Ltd. v. Energy Conservation System, Inc., 628 F. Supp. 1462 (S.D.N.Y. 1986), for the proposition that the buyer's use of contracted-for goods constitutes acceptance.  Def. Mem. 9. KSW asserts that, notwithstanding its acceptance of the goods, UCC §§ 2-714 and 2-717 permitted it to withhold payment on the contract to remedy JCI's alleged breach.  Pl. Mem. 5.

### a.      KSW's Acceptance of the Goods Does Not Mandate
###          Summary Judgment in JCI's Favor

First, KSW's claims are not necessarily barred by its acceptance of the goods.  The UCC provides that "[t]he buyer must pay at the contract rate for any goods accepted."  N.Y. U.C.C. Law § 2-607(1).  "When the buyer fails to pay the price as it becomes due the seller may recover . . . the price [] of goods accepted . . . ."  N.Y. U.C.C. Law § 2-709(1) & (1)(a).  Acceptance of goods occurs when the buyer "after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity."  N.Y. U.C.C. Law § 2-606(1)(a); see Kasper Global Collection & Brokers, Inc. v. Global Cabinets & Furniture Mfrs. Inc., No. 10 Civ. 5715 (DF), 2013 WL 3388427, at *22, 25 (S.D.N.Y. July 1, 2013) (same; finding triable issue of fact where it was unclear whether buyer

---

claims generally have a six-year statute of limitations, but claims under the UCC are subject to a four-year statute of limitations that accrues at the time of the breach, regardless of the party's knowledge of the breach).

had accepted goods); <u>Shokai Far E. Ltd.</u>, 628 F. Supp. at 1466 (analyzing whether the buyer's rejection of the goods was timely, despite the buyer's initial acceptance of those goods).

Even the buyer's acceptance of tendered goods does not extinguish all opportunity to recover damages on a breach of contract.  "Acceptance of goods by the buyer precludes rejection of the goods accepted . . . but acceptance does not of itself impair any other remedy provided by this Article for non-conformity."  N.Y. U.C.C. Law § 2-607(2).  As provided in § 2-714 of the UCC,

> (1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2-607) he may recover[,] as damages for any non-conformity of tender[,] the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (3) In a proper case any incidental and consequential damages under the next section may also be recovered.

N.Y. U.C.C. Law § 2-714; <u>see generally</u> <u>Genecco Produce, Inc. v. Sandia Depot, Inc.</u>, 386 F. Supp. 2d 165, 171 (W.D.N.Y. 2005) (although the plaintiff accepted the goods at issue, it could recover damages pursuant to the UCC, § 2-714(2)).  Thus, it is well-settled that acceptance does not end the inquiry.

Furthermore, "[t]he buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract."  N.Y. U.C.C. Law § 2-717.  Although JCI implies that UCC § 2-717 is restricted to breaches of contract involving the non-delivery of goods, UCC § 2-717 contains no such limitation.  Def. Reply Mem. 4 (arguing that the court's approval of a claim

10

under UCC § 2-717 in Created Gemstones, Inc. v. Union Carbide Corp., 47 N.Y.2d 250, 391 N.E.2d 987 (1979), was distinguishable from the present case because, in that case, the goods at issue were not delivered).

In this case, KSW does not dispute that it accepted the AHUs and partially paid JCI for those goods. See Def. 56.1 ¶¶ 16 & 24; Pl. 56.1 ¶ 24 (not addressing, and therefore admitting, JCI's 56.1 ¶ 16, which concerned acceptance of the goods; not disputing, and therefore admitting, the portion of JCI's 56.1 ¶ 24 concerning acceptance and partial payment).

JCI's argument that mere acceptance of the goods requires summary judgment is clearly erroneous. See N.Y. U.C.C. Law § 2-607(2). Summary judgment on JCI's counterclaim would be inappropriate if KSW can state and offer evidence to support a claim, pursuant to UCC §§ 2-714 and 2-717, that it timely notified JCI of the defects in the non-conforming, accepted goods and deducted its damages from the amount still due. N.Y. U.C.C. Law §§ 2-709, 2-714 & 2-717; see N.Y. U.C.C. Law § 2-714 (Official Comment) (stating that the remedies of §§ 2-714 and 2-717 are "frequently" available concurrently); Am. Elec. Power Co., Inc. v. Westinghouse Elec. Corp., 418 F. Supp. 435, 460 (S.D.N.Y. 1976) (denying summary judgment on a counterclaim for the balance of an agreed-upon purchase price where the "plaintiffs have raised factual questions regarding adequate performance of the contract which will have to be resolved at trial"); B. Milligan Contracting Inc. v. Andrew R. Mancini Assocs. Inc., 174 A.D.2d 136, 139, 578 N.Y.S.2d 931 (3rd Dep't 1992) (dismissal of the buyer's counterclaims was erroneous where the buyer timely notified the seller of defects). JCI does not offer any evidence contesting

whether the goods were non-conforming[9] or whether notification was timely.[10]   Instead, JCI

contests the availability of damages, as discussed below.

> b.    **There Are Material Issues of Fact Concerning Whether KSW Incurred Direct Damages**

JCI rests its argument that the remedies of UCC § 2-714 are unavailable to KSW on the

premise that KSW can only state a claim for consequential damages, and that recovery of such

consequential damages were expressly precluded by the terms of the Purchase Order.  Def. Mem.

17-19; Def. Reply Mem. 3-7.  Indeed, the Purchase Order states that, "[i]n no event shall either

---

[9] There are material issues of fact concerning whether the goods were non-conforming.  KSW contends that the Purchase Order required JCI to factory assemble the AHUs, then ship them in multiple sections, and that JCI allegedly failed to take these actions.  Clark Aff. ¶¶ 2-11, Exs. 17-21; Warkol Aff. ¶¶ 13-15; Anderson Aff. Ex. A; see Pl. 56.1 ¶ 8.  JCI does not dispute that "[t]he Purchase Order provide[d] that the AHUs were to be shipped in multiple sections," but it neither admits nor denies that it failed to ship the AHUs in sections.  Def. 56.1 ¶¶ 6, 8, 36.  It further asserts that it had no responsibility for any costs of assembling the AHUs.  Id.

[10] The record also contains questions of fact concerning timely notification.  As quoted above, UCC § 2-714(1) requires notification pursuant to UCC § 2-607(3), which states that "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  N.Y. U.C.C. Law § 2-607(3)(a).  "[T]he notice required to preserve [the buyer's] right to sue for damages need only 'alert [the prospective defendant] that the transaction [was] troublesome.'"  Amerol Corp. v. Am. Chemie-Pharma, Inc., No. 04 Civ. 0940 (JO), 2006 WL 721319, at *8 (E.D.N.Y. Mar. 17, 2006) (quoting Cliffstar Corp. v. Elmar Indus., Inc., 254 A.D.2d 723, 724, 678 N.Y.S.2d 222, 223 (1998)).  Furthermore, under the UCC, generally, "[w]hat is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action."  N.Y. U.C.C. Law § 1-204(2); cf. White v. Schweitzer, 221 N.Y. 461, 464-65 (1917) (in the context of a rejection of goods, the reasonable time period "must be determined as a question of fact").

KSW provided substantial evidence of notification, including correspondence with JCI about an alleged breach beginning in early June 2011, see Clark Aff. ¶¶ 12-15, Exs. 19-22, and evidence concerning conversations with JCI employees before that time, see id. ¶¶ 6-10, Exs. 17-18.  Furthermore, KSW denies photographing the AHUs until after they were rigged to the 11th floor of the Project and states that it was not fully aware of the breach of contract until the crates were unpacked at the Project site in mid-June 2011.  Id. ¶¶ 4-5, 11.  Based on these facts, the Court cannot find, as a matter of law, that KSW failed to provide notice or did so in an untimely manner.  Cf. N.Y.C. Off-Track Betting Corp. v. Safe Factory Outlet, Inc., 28 A.D.3d 175, 178, 809 N.Y.S.2d 70, 74 (1st Dep't 2006) (concerning the timeliness of a rejection of goods, the buyer's two-year investigation of goods in its possession, prior to rejecting them, was reasonable where goods were not perishable and the buyer explored several methods of investigation).

party be liable for incidental or consequential damages of any nature."  Anderson Aff. Ex. A at

12.    KSW contends that its damages related to assembling sections which should have arrived

pre-assembled are recoverable direct damages.  Pl. Mem. 9-13.

As quoted in full above, UCC § 2-714(1) allows for a recovery "as damages for any non-

conformity of tender[,] the loss resulting in the ordinary course of events from the seller's

breach[,] as determined in any manner which is reasonable."  N.Y. U.C.C. Law § 2-714(1).  The

Official Comment to this section explains that "'non-conformity' . . . includes not only breaches

of warranties but also any failure of the seller to perform according to his obligations under the

contract."  N.Y. U.C.C. Law § 2-714 (Official Comment).

The damages contemplated by UCC § 2-714 are referred to as direct or general damages.

See Am. Elec. Power Co., 418 F. Supp. at 454; see also In re CCT Commc'ns, Inc., 464 B.R. 97,

116 (S.D.N.Y. 2011) ("General damages are synonymous with 'direct' damages . . . .").  A buyer

seeks direct damages "when he tries to recover 'the value of the very performance promised.'"

Schonfeld v. Hilliard, 218 F.3d 164, 175 (2d Cir. 2000) (quoting 3 Dan B. Dobbs, Dobbs Law of

Remedies § 12.2(3) (1993)); Versatile Housewares & Gardening Sys., Inc. v. Thill Logistics,

Inc., 819 F. Supp. 2d 230, 237 (S.D.N.Y. 2011) (same).  "Direct damages are typically

expectation damages, measured by what it would take to put the non-breaching party in the same

position that it would be in had the breaching party performed as promised under the contract."

Latham Land I, LLC v. TGI Friday's, Inc., 96 A.D.3d 1327, 1331, 948 N.Y.S.2d 147, 151-52

(3rd Dep't 2012) (where the plaintiff sought to recover "the loss of the benefit of the bargain,"

the damages sought were not barred by a contractual provision excluding consequential

damages); see In re CCT Commc'ns, 464 B.R. at 116 (direct damages "provide the aggrieved

party with the difference between the price he agreed to pay and the value he was to receive

through performance"); Kenford Co., Inc. v. County of Erie, 73 N.Y.2d 312, 319, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989) (direct damages are those that "are the natural and probable consequence of the breach").

As an example of direct damages, in City of New York v. Pullman Inc., 662 F.2d 910 (2d Cir. 1981), the Second Circuit held that a buyer of defective subway cars (the defect in which arose after they were put into use) could recover the cost of repairing the cars under UCC § 2-714(2), the provision concerning direct damages for breaches of warranty. Id. at 916-18. As the Second Circuit explained,

> An appropriate measure of damages under [§ 2-714(2)] is the "actual cost" of a remedy that meets the ultimate requirements of the contract by converting non-conforming goods into goods which will perform as warranted—even if that remedy required replacing defective parts with parts substantially different than those provided under the contract, at a time later than delivery. . . .

Pullman, 662 F.2d at 916-18 (noting that compensation "based on difference in value at the time of the breach" was inadequate when, inter alia, the goods were generally unavailable on the open market); see generally Koenig Iron Works, Inc. v. Sterling Factories, Inc., No. 89 Civ. 4257 (THK), 1999 WL 178785, at ** 5, 10 (S.D.N.Y. Mar. 30, 1999) (citing to UCC § 2-714(1) and allowing the buyer to recover damages for the repair and replacement of defective goods); ATI Telecom, Inc. v. Trescom Int'l, Inc., No. 95 Civ. 9749 (DC), 1996 WL 455010, at *3 (S.D.N.Y. Aug. 12, 1996) (the difference between the price the buyer paid for long-distance telephone service and the price the buyer paid to obtain the service elsewhere constituted direct damages).

In addition, UCC § 2-714(3) states that, "[i]n a proper case any incidental and consequential damages under the next section may also be recovered." N.Y. U.C.C. Law § 2-714(3) (emphasis added). The subsequent section defines incidental and consequential damages as follows:

14

> (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
>
> (2) Consequential damages resulting from the seller's breach include
>
> > (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
> >
> > (b) injury to person or property proximately resulting from any breach of warranty.

N.Y. U.C.C. Law § 2-715.  The Second Circuit has explained that consequential damages "seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach," such as lost profits.  Schonfeld, 218 F.3d at 176.

"In general, the precise demarcation between direct and consequential damages is a question of fact . . . ."  Am. Elec. Power Co., 418 F. Supp. at 459-60 (where the parties had excluded liability for consequential damages and provided examples of such excluded damages in their contract, it was "likely that many of the categories of damages sought by the plaintiffs will ultimately be deemed consequential within the meaning of § 2-175 of the Code, and will not be recoverable," but "the precise scope of direct damages must be left for resolution at trial").[11]

In this case, KSW enumerates what it purports to be direct costs incurred by JCI's supplying non-conforming goods that were not pre-assembled, including assembly costs, costs

---

[11] Thus, although lost profits are a classic example of consequential damages, even lost profits can be considered direct damages when "only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed."  Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 109-10 (2d Cir. 2007).

for the rigger to lift additional crates, costs to construct and design supports, costs for the use of a crane, and a 15% markup for KSW's additional overhead and diminished profits.  Warkol Aff. ¶ 17 and Exs. 4-5, 7, 9-10; Barriere Aff. Ex. G ¶ 12.  The Court does not, at this time, address the reasonableness of KSW's alleged damages.  Concerning simply whether or not is possible for KSW to state a claim for such damages under the UCC and the terms of the contract, this Court cannot find as a matter of law that KSW's damages are precluded consequential or incidental damages.  If direct damages are "what it would take to put the non-breaching party in the same position that it would be in had the breaching party performed as promised under the contract," Latham Land I, 96 A.D.3d at 1331, 948 N.Y.S.2d at 151-52, KSW's enumerated costs might well fall within that definition.  Cases such as Pullman and Koenig Iron Works provide examples of analogous damages that those courts determined to be direct damages.[12]

Furthermore, this Court rejects JCI's overly broad conception of consequential damages, which would include all damages involving the work of third parties. Def. Mem. 17-18.  JCI's interpretation ignores the statutory language of UCC §§ 2-714 and 2-715, particularly the wording in § 2-714 that "incidental and consequential damages under the next section may also be recovered."  N.Y. U.C.C. Law § 2-714(3) (emphasis added).  This phrasing, as well as the separation of the two provisions, implies that the types of damages described in § 2-714 are direct damages, including "the loss resulting in the ordinary course of business from the seller's breach[,] as determined in any manner which is reasonable."  N.Y. U.C.C. Law § 2-714(1).  One

---

[12] The case relied upon by Defendant, Roneker v. Kenworth Truck Co., 977 F. Supp. 237 (W.D.N.Y. 1997), Def. Mem. 18, is not to the contrary.  Roneker 977 F. Supp. at 240-42 (the buyer's damages for replacing a defective truck were deemed consequential when he was able to resell the truck for more than is fair market value and several of his repair costs were either not covered under the warranty or were not attributable to the seller).

such reasonable measurement of loss could be the cost of having a third party remedy the seller's breach.

Moreover, the cases discussed by JCI concern situations involving delay, an issue listed in the description of incidental damages in UCC § 2-715.  N.Y. U.C.C. Law § 2-715(1) (incidental damages include "any other reasonable expense incident to the delay").  See Def. Reply Mem. 4-5 (citing to McNally Wellman Co. v. N.Y.S. Elec. & Gas Corp., 63 F.3d 1188 (2d Cir. 1995) (the buyer's damages were not direct because either the buyer admitted the damages were consequential or they involved costs related to delay, which were deemed incidental by the terms of the contract, notwithstanding UCC § 2-715); Accent Commercial Furniture, Inc. v. P. Schneider & Assocs., PLLC, 110 A.D.3d 1415, 974 N.Y.S.2d 175, 177 (3rd Dep't 2013) (the buyer's costs for its inability to use its office after a delivery of non-conforming furniture were incidental; in addition, the buyer's claims were dismissed because it failed to prevent its own damages by refusing the seller's offer to install temporary, but fully-functional, furniture)).[13]

Thus, given that the line "between direct and consequential damages is a question of fact," Am. Elec. Power Co., 418 F. Supp. at 459-60, it cannot be said as a matter of law that KSW's claimed damages are consequential or incidental, and Defendant's motion for summary judgment in favor of its counterclaim is denied.

---

[13] In addition, the Court disagrees with JCI's reading of Emerald Painting, Inc. v. PPG Indus., Inc., 99 A.D.2d 891, 472 N.Y.S.2d 485 (3rd Dep't 1984).  According to JCI, that decision held that labor and material costs are a form of consequential damages.  Def. Reply Mem. 6.  To the contrary, the court in Emerald Painting discussed labor and material costs as a means of determining the consequential damages of lost profits, but it did not hold that labor and material costs are necessarily consequential damages.  Emerald Painting, 99 A.D.2d at 892, 472 N.Y.S.2d at 487-88.

**B.    JCI's Motion for Summary Judgment on
KSW's Breach-of-Contract Claim**

JCI also moves for summary judgment dismissing Plaintiff's breach-of-contract claim on the basis that JCI is not in privity with the third parties KSW hired to complete the work related to the alleged breach of contract, and KSW's liquidating agreements with these third parties are purportedly invalid.  Def. Mem. 11-17.  Furthermore, JCI contends that all of KSW's damages are barred by the Purchase Order's exclusion of consequential and incidental damages.  Def. Mem. 17-19.

For purposes of JCI's motion for summary judgment, KSW's damages can be grouped into four categories: 1) two subcontractors with whom KSW entered into liquidated agreements; 2) several subcontractor claims that KSW has paid in full; 3) one subcontractor with whom KSW has no liquidated agreement; and 4) KSW's claims for its own overhead and profit.  These categories will be addressed in turn.

**1.    KSW's Damages for Work Completed by GTI and Peepels**

The first category concerns two subcontractors with whom KSW executed liquidated agreements to allow it to recover for those subcontractors' work remedying the alleged breach of contract.  This group includes the subcontractors Galasso Trucking & Rigging, Inc. ("GTI") and Peepels Mechanical Corp. ("Peepels").  See Warkol Aff. Ex. 6 (containing both liquidated agreements); see also Warkol Aff. Exs. 4-5 (invoices).   The claims of GTI and Peepels total $834,204, of which KSW has already paid $615,000.  Def. 56.1 ¶ 29; Pl. 56.1 ¶ 29; Barriere Aff. Ex. G ¶ 12; Warkol Aff. Ex. 6 (KSW paid GTI $275,000 and paid Peepels $340,000).

**a.    KSW's Liquidating Agreements Concerning Unpaid
Amounts Due to GTI and Peepels Are Valid**

To bridge gaps in privity, New York law allows for liquidating agreements wherein contractors can bring an action to collect unpaid claims on behalf of the contractors'

subcontractors.  See Morse/Diesel, Inc. v. Trinity Indus., Inc., 875 F. Supp. 165, 174 (S.D.N.Y.

1994) ("Liquidation agreements are commonly employed in the New York construction industry

as a means to apportion liability among owners, general contractors, and subcontractors, among

whom such efforts are otherwise hindered by a lack of contractual privity.").  The requirements

for such liquidating agreements are "(1) the imposition of liability upon the general contractor

for the subcontractor's increased costs, thereby providing the general contractor with a basis for

legal action against the owner; (2) a liquidation of liability in the amount of the general

contractor's recovery against the owner; and, (3) a provision that provides for the "pass-through"

of that recovery to the subcontractor."  Bovis Lend Lease LMB Inc. v. GCT Venture, Inc., 285

A.D.2d 68, 69-70, 728 N.Y.S.2d 25 (1st Dep't 2001); see Helena Assocs., LLC v. EFCO Corp.,

No. 06 Civ. 0861 (PKL), 2008 WL 2117621, at *9 (S.D.N.Y. May 14, 2008) (same).  The

liquidating agreement "need not take any particular form."  Helena Assocs., 2008 WL 2117621,

at *9 (quoting Barry, Bette & Led Duke Inc. v. State, 240 A.D.2d 54, 56, 669 N.Y.S.2d 741, 743

(3rd Dep't 1998)).

KSW's liquidating agreements with GTI and Peepels meet the requirements for

enforceability.  See Bovis Lend Lease LMB, 285 A.D.2d at 69-70, 728 N.Y.S.2d 25.  As stated

in paragraph two of each agreement, "KSW acknowledges liability to [GTI/Peepels] for the

unpaid portion of [GIT's/Peepels's claim], and does hereby liquidate such liability as hereinafter

provided, and agrees to submit the Claim to JCI."  Warkol Aff. Ex. 6.  Thus, KSW (1) admits

liability to its subcontractors for damages arising from JCI's alleged breach of contract, (2)

agrees to liquidate the liability it recovers for them, and (3) obligates itself to pass its recovery

from JCI to its subcontractors.  See Warkol Aff. Ex. 6.

19

JCI erroneously contends that the liquidating agreements lack an admission of liability. Def. Mem. 13; Def. Reply Mem. 8.  JCI's reliance on Travelers Casualty & Surety Co. v. Dormitory Authority—State of N.Y., 735 F. Supp. 2d 42 (S.D.N.Y. 2010), Def. Mem. 13, is misplaced.  The liquidating agreements in that case were not valid because they were based on implied admissions of liability.  Travelers Cas. & Sur. Co., 735 F. Supp. 2d at 71-72.  In contrast, KSW expressly stated that it "acknowledges liability."  Warkol Aff. Ex. 6.

JCI raises concerns with the provisions of the liquidating agreements determining the amount of damages and reducing damages to account for, inter alia, KSW's litigation costs. Warkol Aff. Ex. 6 (¶¶ 6-7 of each agreement).  Def. Mem. 14; Def. Reply Mem. 9-10.  Contrary to Defendant's contention, it is immaterial that the damages claimed in this litigation are greater than the amount to which KSW admits liability; the liquidation agreements concern the unpaid balance of the subcontractors' claims, but KSW's claims also include the amounts it has already paid.[14]  JCI relies on Helena Associates, 2008 WL 2117621, which does not require that the damages claims in the liquidating agreement and in litigation must be of uniform value.  Id. at 2008 WL 2117621, at *10 ("Because Helena has offered no evidence of a liquidating agreement . . . Helena may not assert damages claims on behalf of [third parties].").

In addition, liquidating agreements "that provide[] for the pass through of only a portion of a recovery" may nevertheless be valid.  Plato Gen. Const. Corp. v. Dormitory Auth. of State, 27 Misc. 3d 1226(A), 911 N.Y.S.2d 695 (Sup. Ct., Kings Cnty. 2010) (finding enforceable a liquidating agreement which awarded the subcontractor the greater of "its ratable portion of the

---

[14] There is no requirement that the plaintiff assert only the subcontractors' claims during litigation; the plaintiff may also assert its own claims.  See N. Moore St. Developers, LLC v. Meltzer/Mandl Architects, P.C., 23 A.D.3d 27, 32-33, 799 N.Y.S.2d 485 (1st Dep't 2005) (faulting the lower court for espousing a "misguided notion that the assertion of independent claims renders a pass-through claim unsustainable").

proceeds" or "the amount specifically attributable to [its] delay claim," minus the amount due to the plaintiff and a portion of the attorneys' fees); see N. Moore St. Developers, 23 A.D.3d at 29, 799 N.Y.S.2d 485 (enforcing a liquidating agreement in which only "a portion of any recovery by plaintiff against defendant would be passed through"); Am. Standard, Inc. v. N.Y.C. Transit Auth., 133 A.D.2d 595, 596, 519 N.Y.S.2d 701 (2nd Dep't 1987) ("[A] suit can be brought in the plaintiff contractor's name even though the subcontractor is made primarily responsible for prosecuting this action and bearing the costs of the litigation.").

Finally, JCI's argument that the liquidating agreements are invalid because KSW "proximately caused" its subcontractors damages by electing to accept allegedly non-conforming goods, is unavailing. Def. Mem. 13. As discussed above, KSW was not required to reject non-conforming goods. In any event, there are contested issues of material fact as to this argument, such that summary judgment cannot be granted. Thus, KSW's liquidating agreements with GTI and Peepels present a valid means for pass through of these subcontractors' claims to KSW.

### b.    KSW's Damages for Amounts Already Paid to GTI and Peepels

To the extent that KSW's damages also include amounts it paid to GTI and Peepels, KSW states an independent claim against JCI. Under JCI's reasoning, see Def. Mem. 15, a buyer could never recover for a third party's work remedying a breach of contract unless there was a contract directly between the seller and the third party. This is not the law. See Caggianelli v. Sontheimer, 46 A.D.3d 1206, 1207, 849 N.Y.S.2d 308 (3rd Dep't 2007) (the plaintiff is not precluded from "hiring a contractor to perform the necessary remediation," even if the contractor's costs would exceed the original contract price); see generally Koenig Iron Works, 1999 WL 178785, at *10 (the plaintiff could recover the cost of having a third party provide a replacement railing after the defendant provided a defective railing).

In summary, JCI's motion for summary judgment concerning the claims involving work by GTI and Peepels is denied.  KSW has offered valid liquidating agreements allowing pass through of GTI's and Peeples's unpaid claims, and KSW has independent claims for the amounts already paid.

### 2.    Subcontractors Whom KSW Paid in Full

The second category involves subcontractors whose claims KSW has allegedly paid in full.  Pl. 56.1 ¶¶ 30-32.  This category includes the subcontractors I. Rasuch, J. Blanco Associates and NEAD Electric, whom KSW paid $102,363 for engineering and electrical work, and Bovis Lend Lease LMB, whom KSW paid $103,938 for use of a job crane.  Barriere Aff. Ex. G ¶ 12; Warkol Aff. Exs. 9-10 (invoices).  JCI asserts that recovery on these claims is barred because JCI is not in privity with these subcontractors.  Def. Mem. 15.  To the extent KSW has paid these claims, see Pl. 56.1 ¶¶ 30-32, summary judgment is denied for the same reasons stated above concerning paid claims for work by GTI and Peepels.

### 3.    KSW's Damages for Work Completed by Bonland

The third category concerns subcontractor Bonland Industries, Inc. ("Bonland"), with which KSW did not enter into a liquidated agreement for its work related to the alleged breach of contract.  See Warkol Aff. ¶ 17 & Exs. 4 & 7 (invoices).  According to KSW, Bonland's costs totaled $553,891 and KSW may still be obligated to Bonland for $247,243 of those costs.  Def. 56.1 ¶ 29; Pl. 56.1 ¶ 29; Barriere Aff. Ex. G ¶ 12; Pl. Mem. 2.[15]

---

[15] KSW stated that, in September 2012, Bonland submitted an additional claim for $1,285,392 for "impact costs to Bonland's work" related to JCI's actions.  In late 2013, Bonland filed an action in State court against KSW.  Aff. of James F. Oliviero ("Oliviero Aff.") ¶ 6 and Ex. 24, Nov. 27, 2013, ECF No. 27-2 (attaching the Verified Complaint in Bonland Industries, Inc. v. KSW Mechanical Services, Inc., No. 653982/2013 (Sup. Ct., N.Y. Cnty. Nov. 18, 2013)).  Bonland seeks its additional claim for $1,285,392 in that lawsuit.  Id.  As KSW's alleged damages in the federal lawsuit do not include Bonland's $1,285,392 claim, the Court will not

Neither the briefing nor the record on the claim related to Bonland is sufficiently clear for the Court to determine that summary judgment should be granted.  For example, the record is unclear as to whether KSW agrees it owes Bonland the $247,243, <u>see</u> Pl. 56.1 ¶ 29 (stating that KSW is "potentially obligated" to Bonland); Barriere Aff. Ex. G ¶ 12 (including Bonland's costs in the damages chart); whether there is any relationship between the state and federal actions; whether a liquidating agreement would be necessary in order for KSW to sue for recovery from JCI for any monies to agrees it owes Bonland but has not yet paid; and whether any provisions of the Purchase Order or any agreement between KSW and Bonland limit Bonland's recourse against KSW, <u>see, e.g.</u>, <u>Bovis Lend Lease LMB</u>, 285 A.D.2d at 71, 728 N.Y.S.2d 25.  Given that neither party has satisfactorily developed the record or explained the law, the motion for summary judgment is denied.  The legal issue may be renewed during the bench trial.  Just as with KSW's damages for costs paid to GTI and Peepels, KSW can state claims for costs it had already paid to Bonland.

### 4.    KSW's Overhead and Profits

The fourth category of damages is KSW's 15% mark up, totaling $239,159, for overhead and profit on its management of the additional work.  Barriere Aff. Ex. G ¶ 12.[16]  A contractor that uses its own workforce to remedy a breach of contract might be entitled to recover a percentage fee for overhead and profit "since it could otherwise have been using its resources in other profit-making activities."  <u>Gold State Flooring Specialist, Inc. v. Manshul Const. Corp.</u>, No. 93 Civ. 4213 (SS), 1995 WL 231366, at *3 (S.D.N.Y. Apr. 19, 1995); <u>see, e.g.</u>, <u>Plato Gen.</u>

---

address that issue.  In addition, KSW plans to implead JCI into the state court action.  Pl. Mem. 2.

[16] In addition, KSW's damages chart includes claims for $56,100 for an "Amex Processing Charge" and $150,000 for "Credit due for not shipping heat exchangers to factory, not factory testing & no factory assembly."  Barriere Aff. Ex. G ¶ 12.  Defendant does not address these claims, and neither will the Court, as it is not clear whether Plaintiff is pursuing these amounts.

Const. Corp., 27 Misc. 3d 1226(A), 911 N.Y.S.2d 695 (awarding the plaintiff its requested 20%

for overhead and profits on costs attributable to the defendant's delay).  "However, where the

non-breaching party hires a third party to complete the work, under New York law it is not

entitled to include overhead and profit."  Pioneer Valley Concrete Serv., Inc. v. JAG I, LLC, No.

10 Civ. 1311, 2013 WL 6230105, at *17 (N.D.N.Y. Dec. 2, 2013); see Intermetal Fabricators,

Inc. v. Losco Grp., Inc., No. 97 Civ. 3519 (THK), 2000 WL 1154249, at *15 (S.D.N.Y. Aug. 14,

2000) (Where the "defendant hired another steel subcontractor to perform [its] work, under New

York law it is not entitled to include its general requirements, overhead, and profit in the

backcharge.").[17]

   In this case, it is uncontroverted that KSW hired subcontractors to handle additional work

necessitated by the alleged breach, but KSW may have also used its own workforce to supervise

and/or assist in the subcontractors' work, as was KSW's practice when working with JCI.  See

Warkol Aff. ¶ 17(viii) (explaining the 15% mark up as compensation to KSW "for the extra

project management required to manage the contractors who completed and corrected JCI's

work"); see generally Clark Aff. ¶¶ 6-14, Exs. 17-21 (demonstrating KSW's Project Managers'

significant involvement with JCI's work).  As such, there is a contested issue of material fact as

to whether KSW is entitled to the claimed overhead and profit because the record is conflicted as

to whether KSW performed some work or subcontracted all of the work to a third party.  Under

---

[17] The cases cited by KSW are not to the contrary because, in those cases, the court considered awarding a percentage for overhead and profit on the work the contractor (and not a subcontractor) completed.  Pl. Mem. 12 (citing Novak & Co., Inc. v. Facilities Dev. Corp., 116 A.D.2d 891, 893, 498 N.Y.S.2d 492 (3rd Dep't 1986) (instructing the Trial Term to consider awarding the plaintiff an additional 10% for profits where the plaintiff incurred, inter alia, excess labor costs); A.E. Ottaviano, Inc. v. State, 202 Misc. 532, 536, 539, 110 N.Y.S.2d 99 (Ct. Cl. 1952) (allowing the claimant "10% for overhead and 10% for profit on each item of increased costs awarded" but listing no award for overhead or profits on the portion of work completed by the claimant's subcontractor)).

the former circumstances, KSW may be entitled to some recovery; under the latter, the claim is not permitted by New York law.

At trial, KSW will need to justify the amount it seeks for these expenses. See Schonfeld, 218 F.3d at 172 ("[A] plaintiff is entitled to recover lost profits only if he can establish both the existence and amount of such damages with reasonable certainty."); Nature's Plus Nordic A/S v. Natural Organics, Inc., No. 09 Civ. 04256 (ADS) (AKT), 2013 WL 5942257, at **11-12 (E.D.N.Y. Nov. 6, 2013) (same). KSW will also have to show that the Purchase Order does not bar this claim.[18] For the purposes of the present motion, KSW has raised material factual issues concerning its entitlement to recovery for overhead and profit.

### 5. KSW's Damages Are Not, As A Matter of Law, Solely Consequential or Incidental

Finally, in support of dismissing the entirety of KSW's breach-of-contract claim, JCI reiterates an argument it made in support of granting its counterclaim: that KSW's damages are barred by the provision of the Purchase Agreement prohibiting consequential and incidental damages. Def. Mem. 17-19; Def. Reply Mem. 6-7. For the same reasons discussed above concerning Defendant's counterclaim, the Court finds that there are genuine issues of material fact concerning the direct or consequential nature of Plaintiff's damages, and these issues preclude dismissing Plaintiff's breach-of-contract claim. JCI's motion for summary judgment on this ground is denied.

---

[18] For example, lost profits are frequently, but not always, considered consequential damages, which are barred by the terms of the Purchase Order. Compare Schonfeld, 218 F.3d at 176 ("The type of consequential damages most often sought is lost operating profits of a business.") with Tractebel Energy Mktg., 487 F.3d at 109-10 (discussing circumstances in which lost profits can be direct damages).

### III.    CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is denied.  The

Parties should refer to this Court's October 17, 2013 Scheduling Order for the pre-trial deadlines.

**SO ORDERED.**

Dated:  Brooklyn, New York
        January 6, 2014

*Vera M. Scanlon*
_____
VERA M. SCANLON
United States Magistrate Judge

26